Hello, everyone. Thank you for convening remotely today. This is Judge Menashe, and I'm joined on the phone by my colleagues, Judge Sack and Judge Wesley. We have four cases on the calendar today, one of which is taken on submission, that is 19-4141, United States v. Sepulveda. The first case in which we'll hear arguments- Wait, wait. You said that Sepulveda is- It's currently on submission for today. Okay. All right. Sorry. Go ahead. The first case in which we'll hear arguments today is number 2429, United States v. Djibo. Ms. Kunstler. Good morning, Your Honors. Sarah Kunstler on behalf of Adam Djibo, and I have on the line co-counsel Susan Kelman. May I begin? Yes, go ahead. Okay. Your Honors, the government has a big problem in this case. It has a suitcase of heroin, but no evidence connecting that suitcase to anyone other than its cooperating witness, Mr. Walden, who the government didn't dare call to testify at Mr. Djibo's trial. No witness, in fact, at Mr. Djibo's second trial connected him in any way to Mr. Walden's suitcase of drugs. For this reason, based on this record, no rational juror could have found Mr. Djibo guilty of a narcotics conspiracy or substantive narcotics offense beyond a reasonable doubt. Your Honors, viewing the evidence in the light most favorable to the government, what do we know? We know that Mr. Djibo booked Mr. Walden's trip to Togo from December 2014 to January 2015. But so what? They were business partners. The evidence showed they were engaged in car exports. It's not extraordinary that a business partner would book a flight for his business partner. We know that Mr. Djibo sent Mr. Walden $1,000. Ms. Kunstler, that's one conclusion. It isn't the only possible conclusion, is it? With respect, I'm sorry to interrupt, but I'd suggest that you speak up a little bit. Judge Wesley, it's a little muffled, and I thought you would want to know that. Speak up a little. There you go. That's better. Is that better? Much better. Sorry. Okay. Sorry. That's great. Well, I think that's all I have to say, Your Honor. It's really hard to have any conclusions, given that Mr. Walden didn't testify, right? What we have, the evidence at trial is this series of nonsensical what's that messages about surgery, hands, kids, playgrounds, and clothes, right? And who knows what these words mean? They could have related to that one conclusion I mentioned, a car enterprise, but they could have related to any number of enterprises, undeclared cash, diamonds, and certainly drugs, right? But there's not that evidence of the what's that messages, plus the other evidence at trial was not enough to tie my client to a drug trafficking case. Are you saying it would be irrational for a jury to make a conclusion that people who use the language that might be deemed code, it certainly wasn't talking about a car transaction, was it? Well, you know, I am saying. Someone buys it. Someone books a ticket for someone. Someone gives them $1,000 for a trip, and they return with a suitcase full of drugs. Is it an irrational conclusion that there was a connection between the trip and the money and the drugs? You know, I do think so, because I... You do think so? Okay. I do think it's irrational because we have no witness here. Oh, you're saying... Sorry, we're having a little... You're saying irrational, right? Right. Okay. I'm sorry. I, you know... Because there's nothing here that shows that my client knew or should have known. I mean, fine, let's... You know, if it was drugs, what kinds of drugs? What quantity of drugs? You know, there's just no... There's no evidence here to establish that my client... Well, the specifics of the transaction are helpful sometimes in conviction, but not necessary, are they? Yeah, but I think that there's inferential leaps here that you have to draw in order to say that my client was a knowing participant in a heroin transaction. Well, that's what happens with circumstantial evidence. What are the... But the standard is they would have to be irrational inferential leaps, correct? Yeah. Yeah. Okay. Okay. That is correct. That's all I wanted to know. Thank you. Yeah. Okay. You know, turning now also to, you know... We look at the statement... Can I just ask before you move on to that? You said that we don't know what the messages are about. Do you have a theory about what the messages mean? Do you think that they actually were talking about surgery? You know, the only witnesses we have who testified... We have other witnesses who testified about transactions my client was involved in, right? We know he was involved in car transactions, right? We know that he had Mr. Walden's name... So you're saying that they might have been talking about car transactions and coded language about surgery? They may very well have been. It's the only external evidence we have. I mean, one of the arguments that the government put in a footnote in their papers is that at trial, my client's lawyer argued that they may very well have been talking about money that was secreted in luggage related to car transactions, right? But it's really... It's not my job here... And the only external evidence here was about car transactions, you know? But really, it's not my job here to have a theory, right? You know, I just think, you know, my argument... I was just curious if you had one. That it's irrational to guess what the codes mean without evidence. And there's no, you know, there's no evidence about what those codes mean. We have a man with a suitcase of drugs. We have codes. We have, you know, car transactions. But you wouldn't deny that they were talking about what Walden was going to do on the trip, right? You know, I... That it was part of planning for the trip. Yeah, I don't deny that. I don't deny that they were, you know, having a conversation in the context of a trip that was happening, right? And that they were speaking in code. But... Okay, sorry, I thought you were going to make a separate point. Yeah, and there's also other evidence that was introduced, messages that Walden had with other people, where he talks about the drugs of his own. It's not, you know... But, you know, the evidence connecting my client to Walden is $1,000, right? What language are you referring to when he refers to the drugs as his own? My drugs? Yeah, there were two messages that were introduced between Walden and another party. And in those messages, he said, you know, I'm trans... He called it... He was speaking to someone, presumably his wife, where he called it your husband's job, and where he calls it my drugs. Well, you know, okay. I mean, I was thinking about a doorman telling me your cab is here. That doesn't mean that I own the cab. It means it's just designated to me. And I'm just wondering how far you can get with my actually meaning I own it. Well, you know, there were a lot... You know, that kind of segues neatly into the next argument in my brief, which is that the district court improperly excluded other text messages and oral statements made in which these drugs are characterized as his own. Multiple, multiple messages. So as I read the record, the district court was skeptical about whether the messages were admissible, but then it said you should argue on a case-by-case basis whether they should be admitted, and the court actually admitted the two messages that you wanted to introduce at trial, right? But so why did the district court actually rule that the messages were not admissible? Well, the district court denied to admit them en masse, right? There was a motion. There were several motions that were made and remade to admit all the messages, and the court said you would admit them on a case-by-case basis. And ultimately admitted two of the messages, right? Okay. So our argument, you know, and then after trial, my client complained and ultimately got a new lawyer because he was upset that the messages weren't let in. And the government said, I don't, you know, I don't understand what you're upset about. This issue is preserved, right? So at that point, I know the government has made a different argument in this briefing here, but at that point, the government argued that the issue was preserved, right? And these messages, you know, when you're looking, you're looking at the weight of the evidence and you're saying, look, there's all these messages between him and Walden, you know, which the government is arguing about drugs. And then there's on the other side, there's these two, these two messages, right? And it wasn't, the context was weighted unfairly, right? Because it made it look like Walden had tons of messages between himself and my client and two messages with another person, right? Looks like those messages were outlier when the reality is, if he was explicitly and continuously communicating his drug dealing in explicit non-coded language with other parties. And you're saying, and you're saying the primitive value of those, of those messages was that Walden was willing to talk about drugs and non-coded language. That, that, that, and that, and that they were his drugs and that they were conversations that did not involve my client. They involved other traffickers. They involved, you know, other couriers who appeared to be working for Walden or with Walden. You know, all of this point, it was either context or Walden's state of mind at the time he was trafficking the narcotics and the effect of, you know, so, and it didn't, the audio files and what that message is, the work would have allowed the jury to understand what Walden thought his role was at the time. Who did he think he answered to? Who did he think the drugs belong to? And, and, you know, and in the context of his dealings, what did he think his relationship was to Jibo? Thanks. I think we have that argument. You've reserved time on rebuttal, so we'll hear from you again. But let's hear from the government first. Mr. Pilmar. Thank you, Your Honor. May it please the court. Philip Pilmar on behalf of the United States, and I represented the government at the retrial below. It was rational for the jury to determine, in crediting all reasonable inferences in the government's favor, that the evidence in this case proved beyond a reasonable doubt that Donald Jibo conspired to import heroin and aided and abetted that importation. It's undisputed that Jibo's co-conspirator, Stanley Walden, was caught at JFK airport trying to smuggle 6.5 kilograms of heroin in his suitcase. The flight for that trip was booked by Jibo. Jibo gave Walden $1,000 in advance of that trip. Jibo was going to meet Walden when he landed with the drugs. And Jibo and Walden exchanged hundreds of coded messages before and during that trip. As counsel points out, the messages at first glance may seem nonsensical. They talked about surgery on three hands, or Jibo said to Walden, on the kids issue, they're kind of short in town. But the meaning of those messages, when read in context, is clear. As Jibo and Walden planned that Walden would return with something, need to go past some kind of security, that it was dangerous. And the inference can clearly be drawn that Jibo knew what was in that suitcase because Jibo was not just a passive participant in these conversations. He planned all aspects of this drug smuggling operation, from the number of, quote, hands that they would be doing. He said in his own words, he was the one talking to his, quote, boys, or the, quote, doctors in Togo to make sure everything ran smoothly. So when counsel argues there's no evidence connecting the drugs to anyone other than Walden, that's incorrect. Because in this case, unlike many cases, we have hundreds and hundreds of messages between the two parties. Prior to the trip, planning the trip, as they are... Well, we know they were coordinating something, but you just said that we know that Jibo knew what was in that suitcase. But isn't it possible that they exchanged a lot of coded messages, but Walden came back with a different substance or a different quantity than Jibo would have expected? Your Honor, the governor was not required to prove, to sustain a conviction that Jibo knew exactly which type and the exact quantity of narcotics. And there's also, as this court held in U.S. v. Detron Davis, there's an inference to be drawn that someone who organizes a shipment knows its content. I submit to you, Your Honor, it would have been irrational for the jury to determine that the person who booked the flight paid $1,000 in advance of the trip and sent hundreds of messages saying, I'm talking to my boys, I'm talking to the doctors, are we going to do two hands, one hand, three hands? The messages show that Jibo is in control of the situation, that he is really planning all aspects, that he's not a subordinate role. And I submit, Your Honor, it would have been irrational for Jibo or the person organizing the trip to do all that, to plan to meet Walden, and then be shocked when instead of the diamonds that he was expecting, supposedly, Walden actually shows up with heroin worth hundreds of thousands of dollars at a wholesale value, nearly $2 million on the street. And therefore, Your Honor, I submit it was entirely rational in crediting all inferences, all reasonable inferences, excuse me, in the government's favor, that Jibo knew exactly what was in that shipment, because he arranged all aspects of it. Well, he is entitled to argue that the messages are not necessarily about the drugs. I mean, wouldn't the other messages that were not introduced have provided context that allowed him to make that argument? Wasn't he prevented from saying that, you know, there's no reason to think the coded messages were about drugs, because Walden speaks about drugs openly in other contexts? Well, two responses to that, Your Honor. First, there was an argument already made from the messages that were submitted to the jury that Jibo, excuse me, that Walden, when Walden said my drugs, it meant his drugs alone. And the jury was entitled to reject that argument in the face of the messages of Jibo organizing all aspects of the trip. I also submit that saying my drugs alone does not necessarily indicate who owned the drugs. And in fact, the government was not required to- But if you had a greater volume, if you had a greater volume of Walden talking about my drugs, wouldn't it be less likely that the jury would say that that wasn't dispositive? Maybe that would lead to a more plausible inference that Walden wasn't charged, or it was Walden's drugs. Doesn't the volume of messages make a difference? I understand that those two were admitted. But that seems to be only part of the available evidence. It could make a difference, Your Honor, depending on the volume. But I submit, if you look through the 375 messages, the vast majority of them are nonsensical and do not have any relevance and do not fit into a hearsay exception. And the counsel below admitted as much. After he moved for their admission, he admitted that they were not admissible en masse, that he was giving a lot for either context and that many of them were hearsay and that he would narrow them down. And I submit there wasn't really context there to most of those messages. Well, can I ask a question about that? Because I note that at the original application, the court said that ultimately it expressed some skepticism. But it also said, I'm going to quote now, this is 459 on line 12. I will get more thoroughly into it at the trial. The court then held that the comments were, that his comments, this is Judge Deary, were not a ruling but an observation. Now, as I understand it then, ultimately the two statements in question that were admitted were offered. Then the court said, if there are any other specific references you haven't included in your letter, I think they'll fall, let me know in advance. The court, but did Jibo never sought, I'm looking at A729 to 35, Jibo never sought to introduce any other of those statements, did they, after that initial inclination and the offering of the two? Was there any other application to admit additional statements that appears in the record? That's absolutely correct, Your Honor. So what happened was- So I don't, I don't, if there's nothing where these additional statements were offered, there's no ruling to review, am I- Your Honor, that's exactly our position as well. Okay, I'm anxious to hear Ms. Kunstler tell me where the, where the ruling is, because if it's preserved, then that's something we'll have to deal with. But if there was no ruling, if there was no, if none of these additional statements were offered, then there's no, there's no determination to deter, for us to then look at to see if that was there. Yes, Your Honor, if I could put just a little bit more color on that as well. In fact, what Judge, when there was a discussion before opening arguments, I think it was the day before, after jury selection, what Judge Geary in fact said was, steer clear of them for your opening, because I have doubts, and then we'll get more into it. Because what Judge Geary did not want, according to the transcript, was for counsel to make reference to it in the opening when it had not been either admitted or denied, when Judge Geary said, we'll get more into it. And I think- It wasn't like he, it wasn't like he said, I won't entertain any of this. He limited it with regard to the opening, but said that if there were others that they wish to offer, he'd consider it. You know, sometimes if a judge says, look, don't do this anymore, then understood. You don't have to continue to beat your head against the wall to have the judge tell you no in front of the jury. But I don't see that here, at least I don't, from what I've been able to find. I'm anxious to see if there's language to that effect from Judge Geary to the contrary to that. Thank you. Yes, Your Honor. Well, Mr. Kilmar, so I think a moment ago, Ms. Kunstler said that the district court said, why are you still talking about these messages? That argument's been preserved, suggesting that he was not going to admit the other messages. Do you dispute that account of what the district court said? So, Your Honor, that's actually something I said a month and a half after the trial, and it wasn't what the district court said. And I'm happy to address that. So, opposing counsel has raised the issue in the reply brief and here before the court of statements I made during the trial, well after defense counsel had decided which statements to ultimately offer. And the statement you just referenced, which was actually a month and a half after the trial in a completely different context. That message you just were talking about was a statement where the defendant was speaking directly to Judge Geary in court because he was upset that he didn't see certain messages. And I was simply seeking to clarify whether the defendant was talking about the 375 messages offered in Lemonade, which we were, or a different set of messages that weren't in the record at all. And the statement I made a month and a half after the trial do not advance some understanding of Judge Geary's ruling beyond what's in the transcript. What's relevant here is what Judge Geary said and what defense counsel did in response. And my honest lack of precision in these few quotes taken out of context simply doesn't change that fact, I submit, Your Honor. So, your position is the district court never ruled one way or the other on any of the messages except for the two that were admitted? Yeah, actually, it was three messages that he ruled on and only two were offered because one of the messages defense counsel received a favorable ruling, but then ultimately chose not to offer it. And I submit, Your Honor, defense counsel has not pointed to a single citation in the record where Judge Geary denied the messages. In fact, I think when reading all of the transcripts, it's clear that Judge Geary bent over backwards again and again and again, even after being presented with voluminous messages, which were obviously hearsay and nonsensical at many points. For example, many of the messages were being offered, apparently for the state of mind and it was not Walden. It was from somebody else. Those clearly would not have been admissible under 833. So, I think that Judge Geary- But you agree that messages, for example, just showing that Walden spoke about drugs not in code were not going to be offered for truth or for his state of mind, but for his conduct when he discussed these drugs. So, there's like some number of messages that would have been admissible. There may have been some small number of messages. I don't, but I think the point is that defense counsel, out of those 375, narrowed it down to the ones that actually made the key point he wanted to make, and those were ultimately admitted. And the other messages were never actually offered, and there was no actual ruling by Judge Geary. In fact, I think there's a point where he almost withdraws the motion, where I think that's at Government Appendix 42. Is there a point where if the district court says over and over again, I'm skeptical, I don't know, I'm not sure, we can admit these, and keeps deferring it, that we should understand that as a decision that they're not admissible? I think this just doesn't cross that line, or there is no such line? I respectfully disagree, Your Honor, because I think a seasoned district judge, such as Judge Geary, who's been doing this quite some time, when given such a volume of messages, would normally, I don't presume to speak for Judge Geary, but I think it's common for a judge, when getting such messages en masse, to take them more on a case-by-case basis during the trial, once seeing the context of how the trial is going on, and I believe that is what Judge Geary did here. And each time that defense counsel then said to Judge Geary, well, here's a crucial message, Your Honor, I want to focus on this one, I want to focus on this one, Judge Geary admitted it. Okay. All right. If there are no more questions from my colleague, thank you, Mr. Pomar. We'll hear from Ms. Winkler on rebuttal. Thank you, Your Honors, and I agree with your, I think the answer is yes to your question. I think there is a line when it becomes a ruling. I think Judge Geary did make it clear that the messages weren't coming in, and this is a motion that was not just made once, it was a motion that was renewed several times, and I think that there is a line in which Your Honor should find that. Well, then let me ask you, Ms. Kunstler, let me ask you then, just before opening statements, this is what he said. He said, that's not a final ruling, because you've given me so many statements, and a directed counsel will stay clear of it in your opening statements. How much clearer did he have to be? Well, you know, I think that... How much clearer did he have to be? I think that at a certain point, a defendant is entitled to a final ruling. What's the page where they were then offered, after the opening statements, that additional statements beyond the two were offered, and they were rejected? Can you tell me the pages of the record? I'm happy to take a written submission. Yes, it was in, I can give it to Your Honors in writing, and it was in several of the motions that were, it was on paper submitted later on by the... After the trial was over? No, no, during the trial, it wasn't in court, but it was on paper, and I will send that to Your Honors. I would like to turn to my final point about the sentence being procedurally and substantively unreasonable, and that is, you know, assuming ex-arguendo that the evidence was sufficient to convict a client of narcotics importation, I do think the trial court erred in incorrectly calculating the guidelines, right? And this is because Jibo's role, you know, given the evidence presented at trial, is a far cry from organizing a shipment of drugs, right? You know, at Jibo's sentencing, the trial court noted that, you know, that this was a rare opportunity to sentence someone who wasn't a courier, and I understand that impulse to want to do that, you know, but the evidence at trial didn't show that he had a controlling role. In fact, the government stressed at trial that Jibo and Mr. Walden were equal partners no less than 20 times, right? The two-level enhancement under 3B151 only applies where a defendant exercised some degree of control over others involved in the commission of the offense. Well, didn't Walden ask Jibo how many hands they would be doing, which suggests that Jibo was making decisions? Walden asked Jibo for a raise before the trip, right? I mean, aren't there some indications that Walden was using Jibo for direction? Those conversations actually go both ways. There are conversations where, you know, they talk about hands and, you know, it becomes up to Walden to use his better judgment, right? They discuss it as partners. They don't discuss it where one is instructing the others on how many hands or surgeries to do, right? There's a lot that's left up to Walden and his discretion, right? They decide together how many hands there will be, right? And, you know, it's clear also that Walden was free to choose his own dates for travel. He was free to choose who he wanted to meet up with on the trip. He was making his own independent travel arrangements in Togo. You know, all of this, you know, and there's also no evidence that Mr. Jibo determined how much Mr. Walden would be paid. No evidence as to how the relationship was initially forged sufficient to establish that Jibo recruited Walden. You know, there wasn't even evidence that, you know, the government argued that Jibo would be picking him up at the airport, but all they were able to point to was a WhatsApp message in which they made plans to meet as usual, right? So there was no witness to testify about this relationship, right? We're left to surmise the relationship based on these text messages, and these text messages alone do not show my client controlling or directing another party. Okay, Ms. Kintzler, thank you very much. I think we have that argument. The case is submitted. Thank you.